AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)      ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

**UNDER SEAL**

**LODGED**
CLERK, U.S. DISTRICT COURT
05/02/2022
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ DVE _____ DEPUTY

for the

Central District of California

**FILED**
CLERK, U.S. DISTRICT COURT
05/02/2022
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ JD _____ DEPUTY

United States of America

v.

VICTOR MANUEL CHAVARRIA,
  aka "Ernie," and
MIGUEL ANGEL URQUIZA,
  aka "Migz,"

      Defendants

Case No. 8:22-mj-00328-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

     I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of March 30, 2022 in the county of Orange in the Central District of California, the

defendants violated:

    *Code Section*               *Offense Description*
    21 U.S.C. § 841(a)(1)      Drug Trafficking

    This criminal complaint is based on these facts:

   *Please see attached affidavit.*

  ☒ Continued on the attached sheet.

_____
/s/
*Complainant's signature*

_____
Farshid Hashempour, Task Force Officer
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:   May 2, 2022

_____
*Judge's signature*

City and state:  Santa Ana, California

Honorable Karen E. Scott, U.S. Magistrate Judge
*Printed name and title*

AUSA:   Daniel Ahn (714-338-3539)

**AFFIDAVIT**

I, Farshid Hashempour, being duly sworn, declare and state as follows:

## I.  INTRODUCTION

1.   I am a Detective with the Santa Ana Police Department ("SAPD") and also a federally deputized Task Force Officer ("TFO") presently working with the Federal Bureau of Investigation ("FBI").  As a TFO with the FBI, I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), and I am empowered by law to conduct investigations and make arrests for offenses enumerated in 18 U.S.C. § 2516.

2.   I am assigned to the Orange County Violent Gang Task Force ("OCVGTF").  The OCVGTF is composed of federal and local law enforcement agencies, including, but not limited to, the FBI, the SAPD, and detectives from the Anaheim Police Department.  The OCVGTF is responsible for, among other things, investigating violations of federal law committed by criminal street gangs, the Mexican Mafia, and other violent criminal organizations in Orange County.  Prior to this assignment with the FBI, I was a SAPD Police Officer and have been so employed for approximately twenty years.

3.   I have specialized training and experience in investigations involving narcotics and firearms trafficking. During my tenure as a Police Officer, as well as an FBI TFO, I have conducted and participated in numerous investigations of

1

criminal activity, specifically including narcotics and firearms trafficking and violent offenses committed by street gangs.

## II. <u>PURPOSE OF AFFIDAVIT</u>

4.   This affidavit is made in support of a criminal complaint and arrest warrant against VICTOR MANUEL CHAVARRIA, also known as "Ernie" ("CHAVARRIA"), and MIGUEL ANGEL URQUIZA, also known as "Migz" ("URQUIZA"), for a violation of 21 U.S.C. § 841(a)(1) (drug trafficking).

5.   This affidavit is also made in support of search warrants for the below-listed locations and vehicle as described in Attachments A-1 through A-3, for the items to be seized described in Attachment B, which are the evidence, fruits, and instrumentalities of violations of 21 U.S.C. § 841(a)(1) (drug trafficking), 21 U.S.C. § 846 (conspiracy to commit drug trafficking), and 18 U.S.C. § 922(a)(1)(A) (engaging in the business of selling firearms without a license) (the "SUBJECT OFFENSES").   Attachments A-1 through A-3 and B are incorporated herein by reference:

        a.   1024 North Parker Street, Orange, California 92867 ("SUBJECT PREMISES 1"), described in Attachment A-1, and

        b.   750 North Glassell Street, Orange, California, 92867 ("SUBJECT PREMISES 2"), described in Attachment A-2, and

        c.   2016 White Chevy Malibu, bearing California License Plate number 8DJV593 ("SUBJECT VEHICLE"), described in Attachment A-3.

6.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and

information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested arrest and search warrants, and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

7.    On or about March 22, 2022, FBI TFO D. Thai and I met with a Confidential Human Source ("CHS-1") at the Santa Ana Police Department ("SAPD").  CHS-1 was introduced to the OCVGTF by a SAPD Gang Detective, who had previously used CHS-1 and determined that his information was credible.  During the meeting, CHS-1 informed TFO Thai and me that an associate named "Migz" had introduced him to a subject named "Ernie", who engaged in firearms trafficking to include high powered rifles. CHS-1 informed TFO Thai and me that his meetings with "Ernie" had taken place in a music studio called "Trap N Records", in the city of Orange, California.  CHS-1 also stated that he did not have "Ernie's" direct number and had to coordinate all of the deals through "Migz", who acted as a "middleman", or broker, for the deals.  CHS-1 provided the OCVGTF with a phone number, which CHS-1 identified as "Migz's" cell phone number.  At the conclusion of the meeting, CHS-1 agreed to discuss making a controlled purchase from "Ernie".  During the course of the investigation, the OCVGTF positively identified "Migz" as URQUIZA, and "Ernie" as CHAVARRIA.

8.    The OCVGTF utilized CHS-1 to make a controlled purchase of an ounce of fentanyl and a .22 caliber rifle from CHAVARRIA and URQUIZA that took place in SUBJECT PREMISES 1. While conducting surveillance at SUBJECT PREMISES 2, CHAVARRIA was observed carrying a black plastic bin with a yellow lid from SUBJECT PREMISES 2 to the SUBJECT VEHICLE.  Based on a video recording, this bin was later found to contain several handguns and revolvers.

9.    Two days later, a second controlled buy was made by CHS-1 involving CHAVARRIA and URQUIZA.  Prior to the transaction, a surveillance operation was conducted at SUBJECT PREMISES 2.  During this surveillance, CHAVARRIA was observed leaving SUBJECT PREMISES 2 carrying a black backpack, which he placed in the SUBJECT VEHICLE.  CHS-1 arrived at SUBJECT PREMISES 1, where he purchased a sawed-off shotgun and a .38 caliber revolver.  During this meeting, CHS-1 informed CHAVARRIA that he may be interested in placing a larger order of firearms. CHAVARRIA acknowledged the request, but said he would need a cash deposit to ensure the order is completed.  It was later determined that the .38 caliber revolver was taken from the black backpack CHAVARRIA had carried into SUBJECT PREMISES 1 from the SUBJECT VEHICLE.

10.   On April 12, 2022, CHS-1 was directed to set up another controlled purchase of firearms from CHAVARRIA and URQUIZA.  CHS-1 contacted CHAVARRIA and URQUIZA to arrange the deal, and to inform them that a family member would be accompanying on the deal.  The following day, CHS-1 and another

Confidential Human Source ("CHS-2"), posing as the family member, met with CHAVARRIA and URQUIZA at SUBJECT PREMISES 1, where CHS-1 and CHS-2 purchased an AK-47 style rifle and a 7.62mm pistol.  On April 28, 2022, CHS-2 contacted CHAVARRIA to confirm a controlled purchase of one pound of methamphetamine and two more firearms.  The following day, while conducting surveillance on SUBJECT PREMISES 2, CHAVARRIA was observed carrying a black plastic bin with a yellow lid from SUBJECT PREMISES 2 to the SUBJECT VEHICLE.  CHS-1 and CHS-2 drove to SUBJECT PREMISES 1 and met with URQUIZA and CHAVARRIA.  During this meeting, CHS-2 purchased a shotgun, two handguns and approximately one pound of a substance believed to be methamphetamine.  CHS-2 later confirmed that he purchased two handguns that CHAVARRIA had in the same black plastic bin with the yellow lid that CHAVARRIA and CHS-1 had carried from the SUBJECT VEHICLE into SUBJECT PREMISES 1.

### IV. <u>STATEMENT OF PROBABLE CAUSE</u>

**A.    Controlled Buy on March 30, 2022**

11.  On March 29, 2022, at the direction of the OCVGTF, CHS-1 sent "Migz" a text message asking for an "AR15 n maybe n ounce of fetty."  Based on my training and experience, I believe that CHS-1 was asking for an AR-15 rifle and an ounce of fentanyl.  CHS-1 received a response to the text message from Migz, which stated, "For the tool and the confetti will be 2500 for both."  Based on my training and experience, I know that those who engage in illegal trafficking of firearms and narcotics often use coded language when they communicate.  The

term "tool" or "toy" are often used as code words for a firearm. I believe that "Migz" used the innocuous term "confetti" to refer to CHS-1's request of fentanyl.

12.   CHS-1 provided TFO Thai with "Migz's" Instagram profile, which was under the profile name "Migz Urquiza".  Using a law enforcement database, TFO Thai searched the pseudonym "Migz Urquiza", which resulted in a record belonging to URQUIZA. TFO Thai viewed one of URQUIZA's booking photos, and concluded that it was the same individual whose photos were posted on the Instagram profile "Migz Urquiza".  TFO Thai obtained URQUIZA's California Driver License photo and showed it to CHS-1, who positively identified URQUIZA as "Migz" based on CHS-1's stated prior interactions between the two.

13.   On March 30, 2022, CHS-1 met me, TFO Thai, ATF Special Agent Ryan Stearman, and SAPD Detective Manlio Cuevas at a predetermined location.  During this meeting, CHS-1 was given $1700 in prerecorded FBI funds and $800 in prerecorded ATF funds.  CHS-1 was also given recording devices and a transmitter to monitor and record the transaction with "Migz" and "Ernie". CHS-1 then drove to SUBJECT PREMISES 1, where he met with "Migz" and "Ernie".  "Ernie" arrived in the parking lot driving in the SUBJECT VEHICLE with "Migz" seated in the front passenger seat. "Ernie" dropped off "Migz" in the parking lot and left in the SUBJECT VEHICLE.  The SUBJECT VEHICLE was followed to SUBJECT PREMISES 2, where it remained briefly before returning to SUBJECT PREMISES 1.

14.  "Migz" informed CHS-1 that other people were present inside SUBJECT PREMISES 1, who were not aware of their arrangement.  As a result, "Migz" led CHS-1 into the bathroom adjacent to SUBJECT PREMISES 1, where CHS-1 and "Migz" discussed narcotics, specifically the fentanyl.  Shortly thereafter, "Ernie" returned to SUBJECT PREMISES 1 in the SUBJECT VEHICLE after everyone had left besides "Migz".  "Ernie" removed a black and yellow plastic container from the SUBJECT VEHICLE and carried it into SUBJECT PREMISES 1.  Inside SUBJECT PREMISES 1, "Ernie" opened the plastic container, which revealed several pistols and revolvers.  "Ernie" showed CHS-1 other firearms in addition to the rifle he had arranged to buy.  Additionally, "Ernie" explained that he could obtain different types of fentanyl, which he further explained as fentanyl that burns with either a dark or light colored smoke.  "Ernie" then provided CHS-1 with a vinyl guitar case to conceal the rifle as he carried it outside.  "Ernie" handled a small Manila envelope with the word "light" written on it, which reflected the color of the smoke that is created when the fentanyl was exposed to heat.  CHS-1 paid "Ernie" and eventually exited SUBJECT PREMISES 1.  At approximately 7:16 p.m., CHS-1 drove back to the predetermined meet location to debrief the transaction.

15.  At approximately 8:08 p.m., CHAVARRIA left SUBJECT PREMISES 1 in the SUBJECT VEHICLE.  The SAPD Vice/Major Narcotics Unit monitored the SUBJECT VEHICLE as it travelled southbound on Parker Street.  The SAPD Vice/Major Narcotics Unit maintained surveillance on the SUBJECT VEHICLE until the 57

Freeway onramp, when they lost visual of the vehicle.  SAPD
Detective Velasco maintained surveillance at SUBJECT PREMISES 2,
when he observed the SUBJECT VEHICLE arrive at approximately
8:42 p.m.  CHAVARRIA was observed carrying a black backpack and
cooler from the SUBJECT VEHICLE to SUBJECT PREMISES 2.  About
two minutes later, CHAVARRIA returned to the SUBJECT VEHICLE and
retrieved a large black plastic container with a yellow lid from
inside the SUBJECT VEHICLE.  Detective Velasco then observed
CHAVARRIA carry the large plastic container into SUBJECT
PREMISES 2.  During a review of the video from the controlled
buy by TFO Thai, CHS-1 was observed carrying a large black
plastic container with a yellow lid from the SUBJECT VEHICLE
into SUBJECT PREMISES 1.

    16.  CHS-1 returned to the predetermined meet location,
where TFO Thai collected the recording devices.  TFO Thai
retrieved the black guitar case and found a black Smith and
Wesson, M&P 15-22, .22 caliber rifle, bearing serial number
JAK0804, and a rifle magazine containing 25 rounds of .22
caliber ammunition.  TFO Thai also retrieved the small Manila
envelope containing a clear plastic bag with a white powdery
substance that TFO Thai recognized as being consistent with
fentanyl.  TFO Thai later conducted a records check of the
license plate on the SUBJECT VEHICLE and learned that it was
registered to CHAVARRIA.  TFO Thai obtained CHAVARRIA's
California Driver License photo, which he showed to CHS-1.  CHS-
1 positively identified CHAVARRIA as "Ernie".  TFO Thai later

weighed the plastic bag and its contents and found it to weigh approximately 20.5 grams.

**B.   Controlled Buy on April 1, 2022**

17.   On or about March 31, 2022, at the direction of the OCVGTF, CHS-1 contacted URQUIZA by phone to arrange a controlled purchase of two firearms from URQUIZA and CHAVARRIA.  URQUIZA then texted CHS-1 pictures of various firearms that CHAVARRIA had for sale.  The pictures CHS-1 received included two pistols, one of which had an extended magazine, a rifle, a sawed-off shotgun, and a revolver.  CHS-1 sent another text message to URQUIZA stating, "Will he do 800 for 38 if so I'll get the saw off."  Based on my training and experience and knowledge of this investigation, I believe that CHS-1 was asking if CHAVARRIA would sell the .38 caliber revolver for $800.  CHS-1 then stated that if CHAVARRIA was willing to sell the revolver for $800, then he would also buy the sawed-off shotgun.  URQUIZA responded to CHS-1 by texting, "Tomorrow out the door 1750," which I believe was URQUIZA's confirmation of the buy for the following day.

18.   On April 1, 2022, CHS-1 met me, TFO Thai, ATF Special Agent Ryan Stearman, and SAPD Detective Manlio Cuevas at a predetermined location.  During this meeting, CHS-1 was given $1750 in prerecorded ATF funds.  CHS-1 was also given recording devices and a transmitter to monitor and record the transaction with URQUIZA and CHAVARRIA.  After the briefing, CHS-1 travelled to SUBJECT PREMISES 1, where he met with URQUIZA.

19.   Simultaneously, SAPD's Major Narcotics/Vice Unit was conducting surveillance at SUBJECT PREMISES 2.  At approximately 5:32 p.m., SAPD Detective N. Vega observed the SUBJECT VEHICLE arrive at the location.  An unknown female exited the SUBJECT VEHICLE and went inside SUBJECT PREMISES 2.  A male subject left SUBJECT PREMISES 2 carrying a black backpack, which he placed inside the SUBJECT VEHICLE.  CHAVARRIA then got into the driver's side of the SUBJECT VEHICLE, and drove to SUBJECT PREMISES 1.  Upon his arrival at SUBJECT PREMISES 1, SAPD Detective G. Corona identified the male subject as CHAVARRIA, who exited the SUBJECT VEHICLE and walked into SUBJECT PREMISES 1 carry the black backpack.

20.   After entering SUBJECT PREMISES 1, CHS-1 spoke to CHAVARRIA about the possibility of placing a large order of firearms.  CHAVARRIA explained that he could fulfill a large order, but would need a deposit to ensure the buyer would follow through with the transaction.  CHS-1 paid CHAVARRIA for the sawed-off shotgun and the .38 caliber Taurus revolver. CHAVARRIA placed the firearms in the same vinyl guitar case used on the previous buy and gave it to CHS-1.  CHS-1 left the business and was followed to the predetermined meet location, where the firearms and recording devices were collected before CHS-1 was debriefed by TFO Thai and SA Stearman.[1]  TFO Thai later

_____

[1] Since 2019, CHS-1 has provided the SAPD Gang Unit with information on the whereabouts of wanted subjects, and has assisted in the identification of unknown suspects wanted for crimes including robbery, burglary and homicide.  To date, CHS-1 has not received any financial compensation or consideration for
*(footnote cont'd on next page)*

reviewed the audio and video recordings related to the controlled purchase conducted on April 1st.  During the debrief of CHS-1, TFO Thai was told that CHAVARRIA removed the Taurus .38 caliber revolver from a cardboard box that was inside a black backpack.

**C.   Controlled Buy on April 13, 2022**

21.  On or about April 9, 2022, CHS-1 received photos of four firearms sent from URQUIZA's cell phone.  The photos depicted an AK-47 style rifle, a 7.62mm pistol and two Glock semi-automatic pistols.  On or about April 12, 2022, at the direction of the OCVGTF, CHS-1 was instructed to call URQUIZA to arrange a controlled purchase of the AK-47 and the 7.62mm pistol from URQUIZA and CHAVARRIA.  CHS-1 was also directed to inform URQUIZA that he would be bringing a family member to introduce to CHAVARRIA for the purpose of arranging deals for larger quantities of firearms.  Shortly thereafter, CHS-1 called TFO Thai to inform him that he had encountered CHAVARRIA while running an errand.  According to CHS-1, CHAVARRIA confirmed the deal for the AK-47 and the 7.62mm pistol for the following day. CHS-1 told TFO Thai that CHAVARRIA was receptive to CHS-1 bringing his "uncle" so they could discuss future transactions.

_____

pending legal cases.  CHS-1 is on parole and has prior arrests for possession of a controlled substance, possession of stolen property, felon in possession of a firearm, and violation of a restraining order.  After the controlled buy on April 1, 2022, it was determined that CHS-1 had taken a total of $500 of government funds from the first two buys involving CHAVARRIA and URQUIZA.  This determination was made after bills found in CHS-1's wallet matched the serial numbers of the bills from the controlled buys conducted on March 30th and April 1st.

CHAVARRIA initially gave CHS-1 a price of $5700 for both firearms.

22.   On April 13, 2022, CHS-1 met me, TFO Thai, and SAPD Detective Manlio Cuevas at a predetermined location.   During this meeting, CHS-1 was introduced to CHS-2,[2] who was to portray the role of CHS-1's uncle from Mexico.   Prior to the controlled purchase, CHS-2 was given $5000 in prerecorded FBI funds.   CHS-2 was also given recording devices and a transmitter to monitor and record the transaction with URQUIZA and CHAVARRIA.   CHS-1 and CHS-2 then travelled together to SUBJECT PREMISES 1, where they met with URQUIZA and CHAVARRIA inside the business.   CHS-1 introduced CHS-2 to both men as his "uncle".   CHS-1 spoke to URQUIZA while CHAVARRIA showed CHS-2 different weapons he had for sale.   After handling different firearms, CHS-2 paid CHAVARRIA $5000 in prerecorded FBI funds for the AK-47 rifle and the 7.62mm pistol.   During the meeting, CHS-2 asked CHAVARRIA if he could have his phone number.   CHAVARRIA took down CHS-2's phone number, and then called him so CHS-2 could have CHAVARRIA's number in his phone.   CHS-2 later provided CHAVARRIA's phone number to me.

23.   The 7.62mm pistol was placed in the same vinyl guitar case used during previous buys with CHS-1.   The AK-47 was placed

---

[2] Since 2019, CHS-2 has been working with numerous agencies since 2001 to include the FBI, DEA, ATF, HIS, SAPD, Los Angeles Police Department and the Orange County Sheriff's Department. CHS-2 has conducted over 1,000 controlled purchases and has testified in federal court on four occasions.   CHS-2 was previously arrested for Driving Under the Influence in 1995 and 1996.   CHS-2 is working for monetary compensation and has received over $500,000 to date.

in a cardboard Amazon shipping box.  CHS-1 and CHS-2 carried the firearms out of SUBJECT PREMISES 1 and were followed by members of the OCVGTF to the predetermined meet location.  At the meet location, the firearms and recording devices were collected before CHS-1 and CHS-2 were debriefed by TFO Thai and me.  CHS-2 advised that CHAVARRIA sold both firearms to him for $5000 instead of the $5700 that was initially discussed.  TFO Thai later conducted a records check on the Armory USA, model AUSA, 7.62mm pistol, bearing serial number A2513, which were purchased from CHAVARRIA and URQUIZA.  The records check revealed that the Armory USA 7.62mm pistol had been reported stolen out of the state of Mississippi.

> **D.  Controlled Buy on April 29, 2022**

24.  On April 14, 2022, CHS-2 called CHAVARRIA's cell phone asking if he had narcotics for sale.  During their conversation in Spanish, CHS-2 used the Spanish word "frio", or cold, to inquire about methamphetamine.  Based on my training and experience, I know that the term "ice" is commonly used to refer to methamphetamine, and therefore CHS-2's request for "cold" is a reference to methamphetamine.  CHAVARRIA acknowledged the request and informed CHS-2 that a pound of methamphetamine would cost $1,100.  During their call, CHS-2 also stated that he was interested in two firearms.  CHAVARRIA informed CHS-2 that he had two shotguns available, which he described as "tactical" and "traditional", respectively.  CHAVARRIA told CHS-2 the price of each shotgun would be $850.  CHS-2 told CHAVARRIA that he would

be back in two weeks and asked CHAVARRIA to send him photos of
the shotguns.

25.  On April 22, 2022, CHS-2 called CHAVARRIA to inform
him that he would be back next Friday, April 29th, to complete
the transaction they discussed on April 14th.  During the
conversation in Spanish, CHS-2 confirmed that he wanted a pound
of "hielito", or "little ice", referring to methamphetamine.
CHAVARRIA also confirmed that he still had the shotguns that
they discussed the previous week.  CHAVARRIA described one of
the shotguns as a "Mossberg tactical," which he priced at $800.
CHS-2 also inquired about handguns and was informed by CHAVARRIA
that he had two Kimber firearms and may also have Glock firearms
by Friday.  CHS-2 confirmed that he wanted a pound of
methamphetamine, the tactical shotgun and one of the handguns
CHAVARRIA was selling.

26.  On April 28, 2022, CHS-2 contacted CHAVARRIA by phone
to confirm the transaction scheduled for the following day.
CHAVARRIA confirmed that he would have the pound of
methamphetamine and a variety of firearms he could choose from
to include manufacturers like Kimber and Desert Eagle.  CHS-2
informed CHAVARRIA that would arrive at his business between
6:00 and 7:00 p.m.  It should be noted that all calls between
CHS-2 and CHAVARRIA were in Spanish.  These calls were recorded
and later reviewed by FBI Special Agent Luis Altamirano, who is
fluent in both Spanish and English.

27.  On April 29, 2022, in anticipation of the previously
scheduled controlled buy, members of the OCVGTF and the SAPD

established surveillance at SUBJECT PREMISES 1 and SUBJECT
PREMISES 2.  SAPD Sergeant ("Sgt.") D. Park observed the SUBJECT
VEHICLE leave SUBJECT PREMISES 1, which arrived at SUBJECT
PREMISES 2 shortly thereafter.  Upon his arrival, CHAVARRIA was
observed going into SUBJECT PREMISES 2.  A few minutes later,
CHAVARRIA exited SUBJECT PREMISES 2 carrying a black plastic
container with a yellow lid, which he placed on the left rear
passenger seat of the SUBJECT VEHICLE.

     28.  During this time, CHS-1 and CHS-2 met me, TFO Thai,
and ATF Special Agent Ryan Stearman at a predetermined location.
During this meeting, CHS-2 was given $5000 in prerecorded FBI
funds.  CHS-2 was also given recording devices and a transmitter
to monitor and record the transaction with URQUIZA and
CHAVARRIA.  After the briefing, CHS-1 and CHS-2 travelled
together to SUBJECT PREMISES 1, where they met with URQUIZA.

     29.  CHAVARRIA then drove the SUBJECT VEHICLE back to
SUBJECT PREMISES 2, where CHS-1 assisted him in bringing the
black plastic container from the backseat into SUBJECT PREMISES
1.  Sgt. Park then observed CHAVARRIA come back out to the
SUBJECT VEHICLE, where he retrieved a black bag, which CHAVARRIA
slung around his neck before walking back into SUBJECT PREMISES
1.  Inside SUBJECT PREMISES 1, CHAVARRIA handed CHS-2 a plastic
bag containing a white crystalline substance believed to be
methamphetamine.  CHAVARRIA then opened the black plastic
container he and CHS-1 had carried into SUBJECT PREMISES 1.
Inside the black plastic container, CHS-2 observed 8 to 10
handguns of various calibers and manufacturers.  CHS-2 later

stated that CHAVARRIA had shown him an AK-47 style pistol that
he had brought in a black bag, possibly the one CHAVARRIA was
observed carrying into SUBJECT PREMISES 1 from the SUBJECT
VEHICLE.  CHS-2 purchased two handguns, later identified as a
Sig Sauer, model P365, 9mm handgun, bearing serial number
66A352052, and a Springfield, model XDS-9, 9mm handgun, bearing
serial number S3759431.  CHS-2 also purchased a Mossberg 500, 12
gauge shotgun, bearing serial number T508143, which CHAVARRIA
had brought out from underneath a stage in the business.

30.  The Mossberg shotgun was placed in a vinyl Fender
guitar case.  The Sig Sauer and Springfield handguns, which
appeared to be in their original packaging, were placed into a
white Hugo Boss shopping bag along with the large plastic bag
containing the white crystalline substance.  CHS-1 and CHS-2
carried the firearms and the narcotics out of SUBJECT PREMISES 1
and placed them in their vehicle.  CHS-1 and CHS-2 were followed
by members of the OCVGTF to the predetermined meet location.  At
the meet location, the firearms, the substance believed to be
methamphetamine, and recording devices were collected before
CHS-1 and CHS-2 were debriefed by TFO Thai, Special Agent
Stearman and me.  CHS-2 informed us that he paid $4800 for the
aforementioned items.  CHS-2 also stated that URQUIZA was
present for the buy and was watching his interaction with
CHAVARRIA and their surroundings closely.  The white crystalline
substance believed to be methamphetamine was later placed on a
scale at SAPD and found to weigh approximately 451 grams.

### E.   Interstate Nexus

31.   On April 29, 2022, I contacted FBI TFO Rudy Valdez, regarding the weapons and ammunition recovered in his case.  On April 29, 2022, TFO Valdez examined the following firearms and ammunition seized by the FBI during a series of controlled buys, for purposes of determining whether the firearms and ammunition had traveled in interstate or foreign commerce.  During his review of the firearms, TFO Valdez determined that the firearms and ammunition recovered during the aforementioned investigation was the following:

32.   A Smith and Wesson, model MP 15-22, .22 caliber semi-automatic rifle bearing the serial number JAK0804.  Based on TFO Valdez's review of the firearm, TFO Valdez informed me that the firearm was manufactured in Massachusetts.  TFO Valdez determined that the firearm is a firearm as defined in Title 18, United States Code, Chapter 44, Section 921(a)(3), and had to have moved through interstate commerce given that it was recovered in California.

33.   A Harrington and Richardson Arms, Patent Number 3988848, 12 gauge shotgun bearing serial number AX530059.  Based on TFO Valdez's review of the firearm, TFO Valdez informed me that the firearm was manufactured in Massachusetts.  TFO Valdez determined that the firearm is a firearm as defined in Title 18, United States Code, Chapter 44, Section 921(a)(3), and had to have moved through interstate commerce given that it was recovered in California.

34.   A Taurus, model 38 Spl+P, .38 caliber revolver bearing serial number JZ26984.  Based on TFO Valdez's review of the firearm, TFO Valdez informed me that the firearm was manufactured in Florida, Georgia or Internationally.  TFO Valdez determined that the firearm is a firearm as defined in Title 18, United States Code, Chapter 44, Section 921(a)(3), and had to have moved through either foreign or interstate commerce given that it was recovered in California.

35.   A Century Arms, model VSKA, a 7.62 x 39mm rifle bearing serial number SV7053540.  Based on TFO Valdez's review of the firearm, TFO Valdez informed me that the firearm was manufactured in Vermont.  TFO Valdez determined that the firearm is a firearm as defined in Title 18, United States Code, Chapter 44, Section 921(a)(3), and had to have moved through interstate commerce given that it was recovered in California.

36.   An Armory USA, model AUSA, a 7.62 x 39mm pistol bearing serial number A2513.  Based on TFO Valdez's review of the firearm, TFO Valdez informed me that the firearm was manufactured in Texas.  TFO Valdez determined that the firearm is a firearm as defined in Title 18, United States Code, Chapter 44, Section 921(a)(3), and had to have moved through interstate commerce given that it was recovered in California.

37.   A Sig Sauer, model P365, a 9mm handgun bearing serial number 66A352052.  Based on TFO Valdez's review of the firearm, TFO Valdez informed me that the firearm was manufactured in Virginia, New Hampshire and Germany.  TFO Valdez determined that the firearm is a firearm as defined in Title 18, United States

Code, Chapter 44, Section 921(a)(3), and had to have moved through interstate or foreign commerce given that it was recovered in California.

38.   A Springfield, model XDS-9, a 9mm handgun bearing serial number S3759431.  Based on TFO Valdez's review of the firearm, TFO Valdez informed me that the firearm was manufactured in Croatia.  TFO Valdez determined that the firearm is a firearm as defined in Title 18, United States Code, Chapter 44, Section 921(a)(3), and had to have moved through foreign commerce given that it was recovered in California.

39.   A Mossberg, model 500, 12 gauge shotgun, bearing serial number T508143.  Based on TFO Valdez's review of the firearm, TFO Valdez informed me that the firearm was manufactured in Connecticut or Texas.  TFO Valdez determined that the firearm is a firearm as defined in Title 18, United States Code, Chapter 44, Section 921(a)(3), and had to have moved through interstate commerce given that it was recovered in California.

40.   Twenty-five rounds of Aguila .22 caliber ammunition; stamped "A."  Based on TFO Valdez's review of the ammunition, TFO Valdez informed me that the ammunition was manufactured internationally.  TFO Valdez determined that the ammunition identified in this report is ammunition as defined in Title 18, United States Code, Chapter 44, Section 921(a)(17)(A), and had to have moved through foreign commerce given that it was recovered in California.

**F.    Drug Analysis**

41.   The narcotics seized during this investigation were later sent to the DEA Southwest Lab for quantitative and qualitative analysis.  I received chemical analysis report for the package of white powdery substance from the DEA Southwest Lab, which stated that they had been determined to be fentanyl with an actual weight of 19.7 grams.  The white crystalline substance obtained from the controlled buy on April 29, 2022, will be packaged and sent to the DEA Southwest Lab for analysis. The lab results for this exhibit, which is believed to be methamphetamine, is still pending analysis by the lab.

42.   Based on my training and experience, which includes observing methamphetamine and fentanyl, I submit that there is probable cause to believe that the narcotics from CHAVARRIA and URQUIZA are in fact methamphetamine and fentanyl.  Additionally, based on my training and experience, I believe that the amounts of 19 grams of fentanyl and 451 grams of methamphetamine are more than what would be possessed for personal consumption, and that possession of that amount of each drug shows that they were possessed for the purpose of distribution.

**G.    Federal Firearms Licensing Inquiry**

43.   On or about April 14, 2022, SA Stearman conducted a query of the ATF Firearms Licensing System ("FLS"), which revealed that neither CHAVARRIA nor URQUIZA are or have been a federal firearms licensee, which would allow them to lawfully engage in the business of selling firearms.

V.   **TRAINING AND EXPERIENCE ON DRUG AND FIREARM OFFENSES**

44.   Based on my training and experience and familiarity with investigations into drug and firearm trafficking conducted by other law enforcement agents, I know the following:

a.   Based on my training and experience, I know that individuals engaged in the illegal sales of firearms and narcotics often keep records and evidence of such conduct at their residences.  Such evidence can be found in the form of, but not limited to, the following items:  pictures, receipts, handwritten ledgers (e.g., pay-owe sheets), gun cases and original boxes, and cellular telephones.  Since the residences are where these individuals often spend the most time, it is common to find evidence of their illegal activity there.

b.   Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

c.   Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where drug traffickers have ready access to them, such as on

their cell phones and other digital devices, and in their
residences.

        d.   Communications between people buying and selling
drugs take place by telephone calls and messages, such as e-
mail, text messages, and social media messaging applications,
sent to and from cell phones and other digital devices.  This
includes sending photos or videos of the drugs between the
seller and the buyer, the negotiation of price, and discussion
of whether or not participants will bring weapons to a deal.  In
addition, it is common for people engaged in drug trafficking to
have photos and videos on their cell phones of drugs they or
others working with them possess, as they frequently send these
photos to each other and others to boast about the drugs or
facilitate drug sales.

        e.   Drug traffickers often keep the names, addresses,
and telephone numbers of their drug trafficking associates on
their digital devices and in their residence.  Drug traffickers
often keep records of meetings with associates, customers, and
suppliers on their digital devices and in their residence,
including in the form of calendar entries and location data.

        f.   Drug traffickers often use vehicles to transport
their narcotics and may keep stashes of narcotics in their
vehicles in the event of an unexpected opportunity to sell
narcotics arises.

        g.   Drug traffickers often maintain on hand large
amounts of United States currency in order to maintain and
finance their ongoing drug trafficking businesses, which operate

on a cash basis.  Such currency is often stored in their residences and vehicles.

h.   Drug traffickers often keep drugs in places where they have ready access and control, such as at their residence or in safes.  They also often keep other items related to their drug trafficking activities at their residence, such as digital scales, packaging materials, and proceeds of drug trafficking. These items are often small enough to be easily hidden and thus may be kept at a drug trafficker's residence even if the drug trafficker lives with others who may be unaware of his criminal activity.

i.   It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers.  These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[3]

45.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I

---

[3] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such
*(footnote cont'd on next page)*

know that the following electronic evidence, inter alia, is often retrievable from digital devices:

      a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

      b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable

---

as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

      c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

      d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

  46.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

      a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus,

often a controlled environment with specially trained personnel
may be necessary to maintain the integrity of and to conduct a
complete and accurate analysis of data on digital devices, which
may take substantial time, particularly as to the categories of
electronic evidence referenced above.  Also, there are now so
many types of digital devices and programs that it is difficult
to bring to a search site all of the specialized manuals,
equipment, and personnel that may be required.

    b.    Digital devices capable of storing multiple
gigabytes are now commonplace.  As an example of the amount of
data this equates to, one gigabyte can store close to 19,000
average file size (300kb) Word documents, or 614 photos with an
average size of 1.5MB.

    47.    The search warrant requests authorization to use the
biometric unlock features of a device, based on the following,
which I know from my training, experience, and review of
publicly available materials:

    a.    Users may enable a biometric unlock function on
some digital devices.  To use this function, a user generally
displays a physical feature, such as a fingerprint, face, or
eye, and the device will automatically unlock if that physical
feature matches one the user has stored on the device.  To
unlock a device enabled with a fingerprint unlock function, a
user places one or more of the user's fingers on a device's

fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.   Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress CHAVARRIA or URQUIZA's thumbs and/or fingers on the device(s); and (2) hold the device(s) in front of their face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

48.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII.  **CONCLUSION**

49.  For all the reasons described above, there is probable cause to believe that CHAVARRIA and URQUIZA violated 21 U.S.C. § 841(a)(1) (drug trafficking).

50.  Further, there is probable cause to believe that the items listed in Attachment B, which constitute evidence of violations of 21 U.S.C. § 841(a)(1) (drug trafficking), 21 U.S.C. § 846 (conspiracy to commit drug trafficking), and 18 U.S.C. § 922(a)(1)(A) (engaging in the business of selling firearms without a license) (the "SUBJECT OFFENSES") will be found at the SUBJECT PREMISES and SUBJECT VEHICLE, as described in Attachments A-1 through A-3.


/s/
_____
FARSHID HASHEMPOUR
Task Force Officer
Federal Bureau of
Investigation


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 2nd day of May,
2022.

_____
HONORABLE KAREN E. SCOTT
UNITED STATES MAGISTRATE JUDGE